**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| CHELSEY RENEE MEADOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:13-CV-114 |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Chelsey Renee Meador ("Meador") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI"), and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Specifically, Meador alleges that the Administrative Law Judge ("ALJ") erred by failing to give her treating doctor's opinion greater weight and that the ALJ improperly discredited Meador's testimony about the severity of her symptoms. I conclude that substantial evidence supports the Commissioner's decision on both grounds. Accordingly, I **RECOMMEND DENYING** Meador's Motion for Summary Judgment (Dkt. No. 13), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 15.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Meador failed to demonstrate that she was disabled

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

under the Act.² Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Meador protectively filed for SSI and DIB on November 16, 2009, claiming that her disability began on January 1, 2009. R. 12. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 48–83. On September 6, 2011, ALJ Thomas W. Erwin held a hearing to consider Meador's disability claim. R. 26–45. Meador was represented by an attorney at the hearing, which included testimony from Meador, her mother, Tracy Campbell, and vocational expert Mark Hileman.⁴ R. 26–47.

On October 14, 2011, the ALJ entered his decision analyzing Meador's claim under the familiar five-step process⁵ and denying Meador's claim for benefits. R. 9–21. The ALJ found

---

² The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

⁴ Mark Hileman's last name is misspelled in the hearing transcript as Heilman. R. 26–27, 41–44. 123–27.

⁵ The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the

2

that Meador suffered from the severe impairments of obesity and affective disorder. R. 15. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 15. The ALJ further found that Meador retained the RFC to perform a full range of work at all exertional levels, but she is limited to simple routine, repetitive tasks that require no more than occasional decision making and occasional changes in the work setting; she cannot perform production rate or pace work with strict production standards, or have more than occasional interaction with co-workers, supervisors, or the public. R. 17–18. The ALJ determined that Meador did not have relevant past work (R. 19), but that Meador could work at jobs that exist in significant numbers in the national economy, namely housekeeper/cleaner, laundry worker, and photocopy machine operator. R. 20. Thus, the ALJ concluded that she was not disabled. R. 21. On February 1, 2013, the Appeals Council denied Meador's request for review (R. 1–4), and this appeal followed.

## ANALYSIS

Meador asserts that the ALJ erred in two respects. First, Meador contends that the ALJ erred in failing to give more weight to the opinion of treating her treating mental health doctor, Jitendra Desai, M.D. Second, Meador argues that the ALJ improperly discredited Meador's statements of disabling symptoms. I find that substantial evidence supports the ALJ's decision on each ground, and recommend affirming the final decision of the Commissioner.

### Treating Physician

Meador saw her treating psychotherapist, Jitendra Desai, M.D., on numerous occasions during the relevant period for treatment of bipolar disorder. Dr. Desai stated in November 2009 that Meador was not able to function in school and employment (R. 226) and later noted in July

---

claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

2011 that Meador was unable to hold a full time job. R. 256. The ALJ rejected this opinion to the extent that Dr. Desai suggested Meador was unable to perform full time work. R. 19. I find that the ALJ's decision to reject Dr. Desai's opinion is supported by substantial evidence.

The social security regulations require that an ALJ give the opinion of a treating physician source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citations omitted).

Meador is in her early twenties and has a history of bipolar disorder. She began seeing Dr. Desai at Walnut Avenue Associates, PC as early as 2007 while she was in high school. R. 244. Meador continued to receive treatment from Dr. Desai through her alleged disability onset date of January 1, 2009. On April 28, 2009, Meador reported to Dr. Desai that she had ceased taking her medication—Geodon and Depakote—because they made her drowsy. R. 231. Meador also reported being happy, but more irritable, and was having difficulty sleeping. Meador stated

4

that she had a new boyfriend, was working sporadically at a grocery store, and had received good grades on her school exams. Dr. Desai assessed a Global Assessment of Functioning score of 50, down from a previous score of 60.[7] Dr. Desai noted that Meador's compliance with treatment was poor, recommended continued monitoring, and asked to see Meador again in two months.

Meador did not see Dr. Desai again until October 19, 2009. R. 230. Meador stated to Dr. Desai that "it is dawning on her that she needs to take her meds" and Dr. Desai noted that Meador was "developing excellent insight into her illness." Dr. Desai also noted stabilization with improved compliance with treatment, as well as good energy, appetite, stress tolerance, grooming, eye contact, and cooperativeness. Dr. Desai assessed a GAF score of 60. Dr. Desai instructed Meador to continue Depakote, begin Trazodone, and return in three months.

On November 23, 2009, Dr. Desai wrote a brief letter to an unknown recipient regarding Meador's functional ability. R. 226. Dr. Desai stated that:

> Ms. Meador has been a patient of mine for the last 22 months. She has been suffering from Bipolar Disorder. She has struggled with the acceptance of her illness and the need for treatment of such. She has not been able to function in school and employment, despite her best efforts.

R. 226.

Dr. Desai's notes from January 11, 2010 show that Meador was "doing well." R. 229. Although she was having some mood swings, Meador was not having temper tantrums and was compliant with her medication. Dr. Desai's examination and review of symptoms was unremarkable. Dr. Desai assessed a GAF score of 55. On April 12, 2010, Meador reported fewer mood swings while compliant with her medications. R. 252. Meador did report dizziness and

---

[7] The Global Assessment of Functioning is a numeric scale ranging from 0 to 100 used by mental health professionals to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health illness." Diagnostic and Statistical Manual of Mental Disorders, 32 (4th Ed. Am. Psychiatric Ass'n 1994) ("DSM IV"). The DSM IV defines GAF scores as follows: a score of 41–50 suggests serious symptoms or serious impairment in social or occupational functioning; a score of 51–60 suggests moderate symptoms or difficulty in social or occupational functioning; a score of 61–70 suggests mild symptoms or some difficulty in social, occupational, or school functioning. DSM IV.

5

tremors, which Dr. Desai attributed to anxiety. Dr. Desai assessed a GAF score of 65 and recommended increasing Meador's dosage of Depakote.

On August 4, 2010, Meador told Dr. Desai that she had stopped taking Depakote for a couple of months and became very anxious as a result. R. 251. Meador offered no reason as to why she had discontinued taking the medication. Meador indicated that she resumed taking Depakote thereafter. Dr. Desai assessed a GAF of 60 and recommended continued medication and psychotherapy. After reporting some depression at a visit on August 24, 2010, Meador was prescribed Wellbutrin to optimize symptom control. R. 250.

Meador appears to have continued compliance with her medication after again reporting to Dr. Desai that she was "doing well" on November 3, 2010. R. 249. However, Meador stated that her Trazodone wasn't working well, and had been experiencing insomnia and weight loss. Dr. Desai found Meador to be pleasant and conversant, and assessed a GAF score of 70. On February 2, 2011, Meador showed continued improvement, reporting to Dr. Desai that she was doing well overall, was compliant with medication, was sleeping better, and was not having any side effects from medication. R. 248. Dr. Desai's observations of Meador were unremarkable, and he again assessed a GAF score of 70. Dr. Desai recommended continuing medication at the current dosage levels.

On May 4, 2011, Meador reported to Dr. Desai that she was "doing ok," although she had been experiencing leg cramps due to Wellbutrin. R. 247. Meador further stated that she had been working two days a week. Dr. Desai noted increased irritability and that Meador should seek anger management, although Dr. Desai's review of symptoms was otherwise unremarkable. Dr. Desai assessed a GAF score of 50.

Meador saw Dr. Desai again on July 14, 2011, and reported that she was doing "fairly well." R. 256. Meador revealed that she had a conflict with a work supervisor, and that "she has a tendency to get an attitude about this person." Dr. Desai noted that Meador's compliance with medication was average, and that Meador displayed a very labile mood and affect. Meador reported that she had gotten a learner's permit to drive. Dr. Desai remarked in his notes that Meador "is presently unable to hold a full time job," but did not elaborate as to why this was the case.

Meador's final visit with Dr. Desai came on October 13, 2011. R. 254. At that time Meador told Dr. Desai that she was "doing about the same." Meador also stated that she did not envision moving out of her parents' house any time soon, and Dr. Desai and Meador discussed the possibility of compensating her parents for lodging. Dr. Desai's observations were unremarkable, and he again declined to adjust Meador's medication regimen. Dr. Desai again assessed a GAF score of 50 without elaboration.

State agency psychologists reviewed Meador's medical file on two separate occasions. On January 20, 2010, Eugenie Hamilton, Ph.D. assessed Meador's mental residual functional capacity. R. 50–53. Dr. Hamilton found that Meador had no understanding or memory limitations. As far as Meador's ability to sustain concentration and persistence at work, Dr. Hamilton noted that Meador's bipolar disorder "interferes with her ability to maintain concentration for extended periods" and that "[d]uring periods of symptom exacerbation, she may have occasional difficulty completing work periods." R. 53. However, Dr. Meador stated that Meador could complete simple or detailed work "with only mild to moderate difficulty." As to Meador's limitations with social interaction, Dr. Meador stated that "[w]ith continued appropriate treatment for bipolar disorder this claimant is capable of getting along with others in

7

the workplace with only mild to moderate difficulty. She would be better off not working with the public." R. 53.

On April 30, 2010, state agency psychologist Louis Perrott, Ph.D. reviewed Meador's records at the reconsideration level. R. 67–70. Dr. Perrott assessed an identical mental residual functional capacity as Dr. Hamilton did at the initial level. Dr. Perrott noted that Meador had no new mental diagnoses, and that Meador "[c]ontinues to be treated using psychotropic meds and seems stabilized, with no recent decrease in levels of functioning. Dr. Perrott also found that Meador remains capable of simple unskilled work that does not involve dealing with the general public." R. 70.

The record also contains statements from Meador's supervisors at Kroger. Pete Mitchell stated in a letter written July 1, 2011 that due to Meador's emotionally unstable condition, she is unable to work a full week. R. 214. Mitchell further stated that when Meador is in a good mood she "works great" but that "the wrong thing said to her will set her off crying or even screaming at people." Mitchell indicated that when Meador got upset, they would send her to her break or even send her home. Kroger co-manager Michael Vanidestine confirmed this in a letter written September 1, 2011. R. 216. Vanidestine did state that he had witnessed improvement and fewer incidents in the previous six months, possibly from a medication change.

Meador testified at the administrative hearing that she was working two days a week at the Kroger grocery. R. 31. Meador explained that she works with her mother at the store and that she didn't think she could handle another job. R. 33–34. Meador stated medicine she was taking was helpful and that when she misses a day of medicine, "you can definitely tell." R. 33. Meador's mother, Tracy Campbell, testified that Meador's employer had been very accommodating in light of Meador's breakdowns. R. 37. Ms. Campbell stated that Meador was

8

working four to nine hours a week, primarily working a cash register, but as a stocker and in the flower shop and bakery departments as well. R. 38–39. Ms. Campbell testified that Meador's medications helped, but that Meador's attempts to increase work hours had been unsuccessful. R. 39–40.

Based on the forgoing record, the ALJ's decision to reject the opinion of Dr. Desai is supported by substantial evidence. The ALJ basis for this decision was that "Dr. Desai's treatment notes frequently assign the claimant GAF scores of 60 and 70, and state that the claimant has intact concentration and improvement with compliance and medications." R. 19. While perhaps this analysis could have been more robust, it is nonetheless supported in the record.

Although there is not a perfect correlation between Meador's compliance with medication and increased GAF scores, the trend is substantial enough to support the ALJ's reasoning. For example, Dr. Desai noted that Meador was compliant with her prescribed medication at visits on October 19, 2009 (GAF 60, "developing excellent insight [into] her illness," R. 230), January 11, 2010 (GAF 55, "doing well," R. 229), November 3, 2010 (GAF 70, "doing well," R. 249), April 12, 2010 (GAF 65, "fewer mood swings," R. 252), and February 2, 2011 (GAF 70, "doing overall well," R. 248). On the contrary, Meador was not compliant with medications on April 28, 2009 (GAF 50, "more irritability" and "not sleeping at all," R. 231) and August 4, 2010 (GAF 60, "has not been compliant…got very anxious," R. 251). Even where Dr. Desai assesses a GAF score suggestive of serious symptoms, other notes in the treatment record suggest otherwise. For example, on July 14, 2011, Dr. Desai assessed a GAF score of 50, but indicated separately that Meador reported she was "doing fairly well." R. 256. Finally, the ALJ did not exclusively recite Meador's high GAF scores to the neglect of her low scores. In

9

reviewing the medical evidence, the ALJ reviewed GAF scores in the 40s and 50s in addition to her higher scores. R. 15–16.

Evidence independent of Dr. Desai's treatment records also lends support to the ALJ's conclusion that Meador improved with compliance of medication. Indeed, Meador herself testified that her medications were helpful. R. 33. Meador's mother and work supervisor also indicated in statements that Meador's mental health improved when she was compliant with medication. R. 40, 216.

The opinions of both state agency psychologists also support the ALJ's decision to discount the opinion of Dr. Desai. Drs. Hamilton and Perrott found some functional limitations caused by Meador's bipolar disorder, but determined that Meador's condition was not completely disabling. R. 50–53, 67–70. It is clear that the ALJ recognized that Meador had no insignificant mental impairments. The key accommodation that both state agency doctors found necessary for Meador—limited interaction with the general public—was included in the ALJ's final RFC. R. 18. The ALJ included numerous other mental limitations, including limiting Meador to simple, routine, repetitive unskilled tasks requiring no more than occasional decision making and occasional changes in setting, and no production rate or pace work with strict production standards. R. 17–18. The ALJ posed a hypothetical question to a vocational expert containing all of these restrictions, and the vocational expert responded that a person with these limitations could perform available work. R. 41–44.

Based on this record, I find that substantial evidence supports the ALJ's decision to reject Dr. Desai's opinion that Meador was not able to perform full-time work. Although Dr. Desai was a treating doctor whom Meador had seen on many occasions, the ALJ's reasons to reject Dr.

Desai's opinion are supported by the record, and I find no basis for remand or reversal on this ground.

## **Credibility**

Meador argues that the ALJ improperly found that her testimony regarding the severity of her symptoms was not credible. Specifically, Meador contends that her testimony is "supported and corroborated" by other evidence of record, and asks the court to remand on this ground. Pl.'s Br. Summ. J. at 9–10. My inquiry is not whether Meador's testimony is corroborated by other evidence. Instead, my inquiry is whether ALJ's decision is supported by substantial evidence in the record before the Court. 42 U.S.C. § 405(g). As substantial evidence does support the ALJ's conclusion regarding Meador's credibility, I cannot recommend remanding or reversing the final decision of the Commissioner.

The ALJ found that Meador's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent" with the RFC. R. 18. The ALJ reasoned that the objective medical evidence and the claimant's treatment history did not support Meador's testimony, especially in light of her improvement and stabilization when compliant with medication. R. 18–19. For the same reasons that the ALJ's decision to reject Dr. Desai's opinion of disability is supported by substantial evidence, so too is the ALJ's decision to find Meador's testimony not fully credible. The record support's the ALJ's analysis that Meador's symptoms from bipolar disorder were not disabling and that she stabilized and improved with treatment.

"If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination." Spencer v. Barnhart, CIV A 706CV00420, 2007 WL 1202865, at *1 (W.D. Va.

11

Apr. 20, 2007) (citing Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir.2001). Here, the ALJ's decision identifies the evidence forming the basis of his credibility determination, and adequately explains his reasons for finding Meador's statements about her symptoms not fully credible. I must therefore affirm the ALJ's credibility determination.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

                    Enter: June 19, 2014

                    *Robert S. Ballou*

                    Robert S. Ballou
                    United States Magistrate Judge